UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
TRENTON DIVISION

| | |
|---|---|
| **DAWN VAN BRUNT**,<br>364 Westwood Ave., Apt. 81<br>Long Branch, NJ 07740<br><br>    Plaintiff,<br><br>  v.<br><br>**WELLS FARGO BANK, N.A.**,<br>420 Montgomery Street<br>San Francisco, CA 94104<br><br>    Defendant. | Case No. 3:19-cv-00170-BRM-TJB<br><br><br>**SECOND AMENDED COMPLAINT**<br><br>**(Jury demand endorsed hereon)** |

Plaintiff Dawn Van Brunt, through counsel, for her Second Amended Complaint against Defendant Wells Fargo Bank, N.A., states:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Dawn Van Brunt ("Plaintiff" or "Van Brunt") was the owner of residential real property, located at and commonly known as 4101 Dairy Court, Freehold, NJ 07728 (the "Property") which she occupied as her primary, principal residence until her family was removed by the Sheriff.

2. Van Brunt is a natural person residing in Monmouth County, New Jersey at her residence of 364 Westwood Ave., Apt. 81, Long Branch, NJ 07740.

3. From approximately July 12, 2007 to July 11, 2017, Defendant Wells Fargo Bank, N.A. ("Defendant" or "Wells Fargo") was the servicer of a note executed by Van Brunt (the "Note") and of a mortgage on the Property that secures said note (the "Mortgage") (collectively, the "Loan"). The Loan was insured by the Federal Housing Authority (the "FHA"). The Loan is attached as **Composite Exhibit 1.**

1

4.      Wells Fargo is an incorporated business under the laws of the State of Delaware that maintains its principal place of business at 101 N. Phillips Ave., Sioux Falls, SD 57104.

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy as more fully detailed throughout the Complaint exceeds $75,000.00 exclusive of damages sought of a punitive nature and/or interest and costs, and is between citizens of different States.

6.      This Court has supplemental jurisdiction to hear all state law statutory and common law claims pursuant to 28 U.S.C. § 1367.

7.      Venue lies in this District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

8.      Van Brunt has a private right of action under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.* (the "CFA"), and such action provides for actual damages, treble damages, reasonable attorneys' fees, filing fees, and reasonable costs of suit. N.J.S.A. § 56:8-19.

## FACTUAL BACKGROUND

### A.  Wells Fargo services residential mortgage loans nationwide.

9.      Wells Fargo is one of the nation's largest providers of residential mortgage home loans.  It services residential home mortgage loans nationwide.

10.     Wells Fargo is a loan servicer and lender. It derives income in a number of ways including (a) payments based on a percentage of each borrower's principal balance pool, (b) float interest, (c) late fees, (d) foreclosure fees, (e) property inspection and preservation fees, and (f) broker opinion fees.

11.     Wells Fargo is a wholly-owned and controlled subsidiary of Wells Fargo & Company (NYSE: WFC), one of the nation's largest financial institutions. Wells Fargo &

Company is a Delaware corporation headquartered in San Francisco, California and a registered bank holding company.

12.     Wells Fargo & Company describes itself as a "diversified, community-based financial services company with $1.87 trillion in assets." *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (Nov. 6, 2018). It provides "banking, investment, and mortgage products and services as well as consumer and commercial finance, through 8,050 locations, 13,000 ATMs, digital (online, mobile, and social), and contact centers (phone, email, and correspondence)." *Id.* Wells Fargo & Company employs approximately 262,000 full-time employees in 37 countries and serves "one in three households in the United States." *Id.*

**B. Wells Fargo employs uniform, nationwide loan servicing, loan modification, and foreclosure practices.**

13.     Wells Fargo utilizes uniform and standardized loan servicing, loan modification, and foreclosure practices nationwide. Much of their standardized loan servicing, loan modification, and foreclosure practices are reliant upon automated processes, systems, and tools.

14.     Wells Fargo's loan servicing, loan modification, and foreclosure practices are governed by federal requirements and obligations.

15.     The Federal Housing Agency ("FHA") is an agency within the United States Department of Housing and Urban Development ("HUD") that supplies mortgage insurance to FHA-approved lenders, insuring loans on single-family homes.

16.     Mortgage insurance protects lenders from the risk of borrower defaults because the FHA agrees to pay lenders in the event of borrower default.

17.     Lenders must be pre-approved to qualify for FHA mortgage insurance. They must also comply with HUD regulations.

18.     Wells Fargo is a pre-approved lender who qualifies for FHA mortgage insurance. Wells Fargo is therefore required to comply with HUD regulations.

19.     As Van Brunt's loan is protected by FHA mortgage insurance, Wells Fargo's predecessor and the borrower(s) executed loan documents that incorporate by reference HUD regulations.

20.     In 2008, the federal government began the Troubled Asset Relief Program (TARP). Pursuant to TARP, all servicers that receive funding from TARP must participate in HAMP.

21.     Wells Fargo received about $25 billion in TARP funds. In return, Wells Fargo agreed to participate in HAMP and be obligated by all Program Documentation (defined below).

22.     In 2009, the Secretary of the Treasury implemented the FHA HAMP, which was designed to minimize foreclosures by incentivizing loan modifications. Pursuant to HAMP, HUD has promulgated HAMP guidelines, regulations, and directives.

23.     Wells Fargo is required to comply with all Program Documentation, HAMP, and other Department of Treasury directives.

24.     Among other things, Wells Fargo is required to review defaulted loans for modification eligibility prior to proceeding with any foreclosure. Wells Fargo is required to offer to all defaulted borrowers modifications for which they are eligible prior to conducting any foreclosure. HAMP guidelines require that Wells Fargo undertake a number of specific and non-discretionary steps to determine a consumer's eligibility for modification or other relief. If, after completing a formula-driven net present value analysis, the modified loan would be more profitable than the non-modified loan, HAMP guidelines require Wells Fargo offer a trial period plan modification. If the borrower completes the trial period plan, Wells Fargo is required to permanently modify the loan.

4

25.     To request a modification, FHA regulations require each borrower submit standardized form assistance applications, financial worksheets, hardship affidavits, and acknowledgment and agreements (the "Modification Contract"). Pursuant to the standard form Modification Contract, the borrower makes a legal representation as to the material truth of all information provided. The borrower agrees to provide all requested financial and hardship information. Among other things, the borrower also promises to undergo credit counseling if they are so requested. In return, Wells Fargo agrees in the Modification Contract to examine the borrower's eligibility for all available modifications. If the borrower is eligible for any available mandatory modifications, Wells Fargo is required by the Modification Contract (as well as HAMP, other Department of Treasury directives, and FHA regulations) to extend a trial period plan[1].

26.     These standardized Modification Contracts incorporate all applicable obligations in the HAMP provisions, regulations, directives, guidelines, procedures, documentation, instructions, bulletins, frequently asked questions, letters, directives, and other communications issued by the Department of Treasury and federal agencies (collectively, "Program Documentation.").

27.     In all relevant communications with borrowers, Wells Fargo represents that it will extend trial period plans to any borrower who is eligible for a mandatory modification under HAMP.

28.     Wells Fargo receives incentive payments for every successful modification under the Program Documentation. However, Wells Fargo also benefits from unsuccessful

---

[1] In some circumstances the FHA regulations and guidelines require lenders like Wells Fargo to evaluate borrowers who do not submit applications using the same criteria as for the underwritten applications, except for the consideration of the borrower's income. Some of these "Streamlined" modifications may also have been impacted by the software errors.

modifications, along with foreclosures. If a federally-mandated modification is not required, Wells Fargo can offer modification and temporary payment plans outside of HAMP, often under terms that are less favorable to the borrower than federally-mandated plans. Furthermore, Wells Fargo can continue to obtain foreclosure, late fees, property inspection, preservation, and broker opinion fees. What is more, Wells Fargo receives higher float interest payments for non-modification options such as a short sale or a foreclosure. It further receives higher principal balance pool payments if it does not reduce the principal balance pursuant to Program Documentation requirements.

### C. Wells Fargo repeatedly fails to oversee, test, and audit its uniform loan servicing, mortgage modification, and foreclosure practices.

29.     In 2010, the Office of Comptroller of the Currency ("OCC") discovered multiple deficiencies and unsafe and unsound practices in Wells Fargo's residential mortgage servicing, modification, and foreclosure programs. The OCC determined that Wells Fargo failed to oversee, audit, and test its foreclosure and modification tools and practices and failed to comply with applicable laws, prioritizing profits over compliance and causing substantial harm to consumers.

30.     The OCC's investigation and related investigations resulted in millions in fines assessed by the Federal Reserve to Wells Fargo & Company.

31.     As a result, Wells Fargo agreed to two consent orders with the OCC, committing to taking all necessary and appropriate steps to remedy the deficiencies and unsafe and unsound practices identified by the OCC. In the consent orders, Wells Fargo agreed to form compliance committees and programs subject to the oversight of the OCC. It agreed to adopt processes to better oversee, audit, and conduct ongoing testing of its loan servicing, modification, and foreclosure tools and practices and ensure legal and regulatory compliance. Some such agreed

processes were targeted at better oversight, auditing, and testing of automated tools, modification and foreclosure review, and fee assessments.

32.　　But Wells Fargo failed to remedy the deficiencies and unsafe and unsound practices identified by the OCC. It failed to adopt adequate oversight, auditing, and testing processes and programs. And it failed to detect and/or correct repeated and systemwide servicing, modification, and foreclosure process errors.

33.　　In 2015, the OCC again determined that, despite the 2011 consent cease and desist orders, Wells Fargo was continually failing to adequately oversee, audit, and test its servicing, modification, and foreclosure practices for compliance. As a result, the OCC assessed millions in monetary penalties against Wells Fargo's parent company, Wells Fargo & Company.

34.　　In early 2018, the OCC discovered additional and ongoing compliance and conduct failures in Wells Fargo's loan servicing, modification, and foreclosure programs and processes. The OCC determined that Wells Fargo's deficiencies and compliance failures constituted reckless and unsafe or unsound practices in violation of federal law and that Wells Fargo failed to implement and maintain an adequate compliance risk management program. It found that Wells Fargo failed to implement adequate oversight, control, auditing, and testing of its servicing, modification, and foreclosure programs and practices. The OCC also found that Wells Fargo failed to adequately report compliance concerns, compliance failures, and Wells Fargo's efforts to remedy them.

35.　　As a result, Wells Fargo & Company and Wells Fargo entered into a consent cease and desist order with the OCC, again agreeing to adopt system-wide compliance programs and oversight.

36.     The Federal Reserve also issued a consent cease and desist order in early 2018 restricting Wells Fargo's growth until governance, oversight, risk management, auditing, and testing is improved. In its consent cease and desist order, the Federal Reserve reports that it determined Wells Fargo "pursued a business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate risk management framework commensurate with the size and complexity of the Firm, which resulted in weak compliance practices.

37.     As a result of the OCC's continued investigations and resulting consent orders, Wells Fargo was and is on notice of serious errors, deficiencies, and unsafe and unsound practices in its loan servicing, modification, and foreclosure processes and practices from 2010 through the present. Wells Fargo was and is likewise aware of the need for oversight, testing and auditing of those processes and practices, including the need for oversight, testing, and auditing of automated tools. Yet Wells Fargo has habitually failed to adopt adequate oversight, testing, and auditing.

**D.  Wells Fargo's automated calculation errors.**

38.     Wells Fargo's deficiencies, unsafe and unsound practices, and failure to conduct adequate oversight, auditing, and testing, resulted in a number of systemic automated calculation errors that greatly affected borrowers.

39.     From 2010 through 2019, Wells Fargo utilized automated mortgage loan modification underwriting tools to determine which default borrowers are qualified for a mortgage loan modification or repayment plan.

40.     By its own admissions, Wells Fargo repeatedly failed to test and audit its automated mortgage loan modification underwriting tool, despite the OCC investigations and consent decrees putting it on notice of significant issues with its mortgage practices. Wells Fargo likewise failed

to adequately verify that its automated mortgage loan modification tools and standard foreclosure practices complied with consent decree requirements, regulations, and laws.

41.     As a result, Wells Fargo wrongfully failed to approve hundreds of borrowers for appropriate mortgage loan modifications and/or repayment plans

**E.  Wells Fargo's "first" automated calculation error**

42.     As a result of its continuing failure to implement adequate oversight, auditing, and test controls, Wells Fargo failed to timely identify a number of automated calculation errors in its mortgage software.

43.     As reported by the OCC, between March of 2013 and October of 2014, an unidentified error caused Wells Fargo to fail to offer modifications to 184 borrowers who were entitled to modification trial period plans.

**D. Wells Fargo's "second" automated calculation error.**

44.     Unbeknownst to the OCC, Wells Fargo's "first" automated calculation error was not its only one.

45.     On August 3, 2018, Wells Fargo's parent company Wells Fargo & Company issued its Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (August 3, 2018) ("August Report"). In its report, Wells Fargo & Company revealed for the first time that it identified an automated calculation error that caused it to wrongfully deny loan modifications and resulted in hundreds of foreclosures of residential mortgage loans in default between April 13, 2010 and October 20, 2015.

> An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010 and October 20, 2015, when the error was corrected. **This error in the modification tool caused an automated**

**miscalculation of attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification** pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie mac) and the U.S. Department of Treasury's Home Affordable Modification Program (HAMP). Customers were not actually charged the incorrect attorneys' fees. **As a result of this error, approximately 625 customers were incorrectly denied a loan modification or were not offered a modification in cases where they would have otherwise qualified. In approximately 400 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered a loan modification, a foreclosure was completed.**

(Emphasis added).

46.    In 2010, Wells Fargo developed two proprietary software tools to evaluate loan modification eligibility depending on the type of loan - the Home Preservation Application (HPA) and the SLoaD tool. Loan modification applications under FHA loans, like Van Brunt's, were decided using the SLoaD tool. *See* a copy of Carmen Bell's March 8, 2018 email attached as **Exhibit 2**.

47.    Each eligibility decision began with capitalizing unpaid fees and charges, including attorney's fees Wells Fargo incurred processing the delinquent loan into the loan balance; then, this sum was re-amortized. *See* HPA Handbook at 00071422-71423 (attached as **Exhibit 3**).

48.    HUD established maximum attorney's fees Wells Fargo could charge in each state and provided Wells Fargo a table setting forth these limits. See Mortgagee Letter 2005-30 (attached as **Exhibit 4**).

49.    Using this table, Wells Fargo was supposed to input the attorney's fees it had actually paid and incurred, but only up to the maximum allowable amount. *See* July 2018 Executive Summary of the Attorney Fee Calculation Error at 00106022 (attached as **Exhibit 5**). Instead, Wells Fargo programmed its HPA tool to *add* the state maximum to the fees that were actually paid and incurred rather than *limit* the allowable fees, which inevitably caused the formula

to erroneously reject borrowers who qualified for modifications. *Id*. As a result, over 900 borrowers who qualified for loan modifications were deemed ineligible.

**Wells Fargo Discovered the Error in 2013 But Ignored it For Two Years**

50.     In August 2013, Wells Fargo discovered its error and knew that "incorrect Attorney's Fees [were] being calculate[d] in HPA that could be impacting decisions." *See* September 5, 2013 email, WF_HERNANDEZ_00144335 (attached as **Exhibit 6**); Review of Dan Pfeil (attached as **Exhibit 7**) at 00000311.

51.     Shortly thereafter, Wells Fargo began to "research and test[] to determine/isolate the problem." September 27, 2013 email at 00144382 (attached as **Exhibit 8**). Senior leaders within Wells Fargo were briefed on the error, and a recommendation was made to fix it. *See Exhibit 7*, Review of Dan Pfeil at 00000311. Week after week, the attorney's fee error was included on the list of potential issues to be prioritized for resolution. Compendium of "change control" requests related to the fee error (attached as **Exhibit 9**). But it took months for Wells Fargo to prioritize or assign resources to fix the problem.

52.     By January 2014, Wells Fargo reviewed 7,000 loans to determine if the mortgage modifications were wrongfully denied and discovered that at least 50 of those were. *See* WF_HERNANDEZ_00001456 (attached as **Exhibit 10**); WF_HERNANDEZ_00002738 (attached as **Exhibit 11**). Yet somehow, Wells Fargo concluded in the same month that no modifications were wrongly denied and that there was no urgency to fix the error. *See* WF_HERNANDEZ_0000476 (attached as **Exhibit 12**); WF_HERNANDEZ_0002724 (attached as **Exhibit 13**).

53.     The enormity of this error and decision is perplexing and, in fact, since this scandal has broken, Wells Fargo has been unable to determine any basis for concluding that no customer

was wrongly denied a loan modification. When asked in a deposition how in 2014 the bank concluded that no one was impacted, Wells Fargo's corporate representative had no answer. 30(b)(6) Deposition of Carmen Bell ("Bell Depo.") at 95:10-18 (attached as **Exhibit 14**).

54.     In January 2014, the employee who found the error in August 2013 (and escalated the issue to senior leaders) and a Wells Fargo risk manager both recommended a temporary fix while Wells Fargo worked on a permanent solution. *See* WF_HERNANDEZ_00001456 (attached as **Exhibit 15**). In fact, Wells Fargo's risk consultant warned that Wells Fargo knew there was a risk of ongoing harm to customers, *i.e.*, wrongful denials of loan modifications. *Id*. Wells Fargo nevertheless ignored this advice, failing to implement even a temporary fix.

55.     In July 2014, Wells Fargo conducted a five-day summit to assess this and other fee processing errors. At this summit, Wells Fargo again acknowledged that the calculation error … "may lead to **incorrect mod program participation decisions by HPU**." *See* WF_HERNANDEZ_00001325-00001326 (attached as **Exhibit 16**) (emphasis added). Despite knowing it could be denying an "unknown" number of loan modifications because of "overstated fees," Wells Fargo still did nothing to fix the problem.

56.     In October 2014, a new project manager, Diane Young, recommended a solution that would only cost the bank $61,950 - or approximately 0.0007% of its 2014 annual revenue of 84 billion.[2] But again, Wells Fargo refused. *See* **Composite Exhibit 17**. Despite knowing that "[i]naccurate fees will continue to be quoted," Young's request for funding was denied because "[s]trategic priorities [had] changed." *See* Wells Fargo emails, attached as **Exhibit 18**.

57.     After this, Susan Crawford, Operational Risk Consultant, advised on May 4, 2015, that continuing to use the fee matrix was "risky" so she asked: "Try for a different fix or accept

---

[2] Wells Fargo's 2014 Annual Report at p. 32 (available at https://www.wellsfargo.com/assets/pdf/about/investor-relations/annual-reports/2014-annual-report.pdf, last visited February 8, 2021).

the risk and close this issue?" *See id.* at 00001713. Wells Fargo accepted the risk. *See* WF_HERNANDEZ_00107884 (attached as **Exhibit 19**) Ms. Crawford continued to voice her concerns and finally, in October 2015, the fee matrix was removed from the HPA tool. This did not, however, completely fix the problem; errors in adding excessive attorney fees for loans made with the SLoaD tool continued, causing additional wrongful loan modification denials until 2018. *See* Exh. 14 (Bell Depo.) at 43:21-46:9; 193:15-25.

**Wells Fargo Concealed the Impact to Van Brunt Until 2018**

58.     Just as Ms. Crawford had predicted in 2015, Wells Fargo did in fact wrongfully deny borrowers loan modifications because of how attorney's fees were calculated. *See* Wells Fargo Business Requirements Document, at 00011932 (attached as **Exhibit 20**). While reviewing a different error in March 2018, Wells Fargo "rediscovered" this attorney's fee error and finally figured out that it harmed borrowers from April 13, 2010 until October 20, 2015. *See* Exh. 20.

59.     Through this review, Wells Fargo also discovered that it had wrongfully denied mortgage modifications for loans analyzed in SLoaD from 2010 until 2018. *See* Exh. 14, Bell Depo. at 44:25-46; *see also* Wells Fargo Business Requirements Documents (attached as **Exhibit 21**). In all, Wells Fargo wrongfully denied loan modifications to 824 borrowers, and caused over 500 of them to lose their homes.

60.     In late 2018 and early 2019, Wells Fargo began sending form letters to customers affected by the "calculation error." The letters typically included a check and informed customers if they were not satisfied with that amount, they could consider mediation through a third-party mediator that Wells Fargo retained.

**Dawn Van Brunt's Experience**

61.     In 2009, Van Brunt had to leave her job in patient care to become the caretaker of her ill father and brother. As a result, Van Brunt experienced financial difficulties and defaulted on the Loan.

62.     On or about August 19, 2011, non-party The Strickland Farm Condominium Association, Inc. (the "COA") commenced an action against Van Brunt in the Superior Court of New Jersey, Law Division, Special Civil Part, captioned *The Strickland Farm Condominium Association, Inc. v. Dawn Rivera*, assigned Docket Number MON-DC-014947-11 (the "COA Action"). A copy of the docket sheet is attached as **Exhibit 22**. The COA commenced the COA Action over $1,819.00 in unpaid common expense assessments. A copy of the COA Action Complaint is attached as **Exhibit 23**.

63.     On October 13, 2012, judgment was awarded in the amount of $4,075.15 to the COA. On October 15, 2013, an Order Permitting the Sale of Van Brunt's Home was entered in the COA Action. A copy of the order is attached as **Exhibit 24**.

64.     In February 2012, Van Brunt reached out to Wells Fargo in an effort to obtain a loan modification to keep the Property.

65.     Meanwhile, on November 19, 2012, Wells Fargo filed a foreclosure action against Van Brunt in the Monmouth County Superior Court, Case No. F-027129-12 (the "Foreclosure Case"). The Foreclosure Case Docket is attached as **Exhibit 25**.

66.     On or about December 2, 2013, Wells Fargo told Van Brunt she did not qualify for a loan modification. A copy of the denial letter is attached as **Exhibit 26**.

67.     On or about December 18, 2013 Van Brunt appealed the modification denial. A copy of the appeal is attached as **Exhibit 27**. Through the appeal, Van Brunt noted "I am more

than capable to pay my mortgage on time every month and therefore I am appealing Wells Fargo's decision." Through correspondence dated January 13, 2014, Wells Fargo denied the modification appeal. A copy of the appeal denial is attached as **Exhibit 28**.

68.     At this time, the COA had scheduled an auction on Van Brunt's home for February 3, 2014.

69.     As Wells Fargo failed to tender Van Brunt the loan modification which she was entitled to, there was no rational basis for Van Brunt to contest the COA foreclosure or otherwise attempt to resolve it as Wells Fargo held the first lien position mortgage. Accordingly, Van Brunt did not take actions to stop the February 3, 2014 auction.

70.     Had Wells Fargo properly tendered the modification offer to Van Brunt, she would have taken immediate steps to resolve the COA Action. For example, Van Brunt could have filed a Chapter 13 Bankruptcy Petition and repaid the COA arrears over a period of up to sixty (60) months.[3] She also could have used her statutory adjournments to postpone the February 3, 2014 sale for a period of up to twenty-eight (28) days. Furthermore, Wells Fargo would have been required to suspend the pending foreclosure action against her.[4]

71.     Had Wells Fargo properly extended the modification offer to Van Brunt, Van Brunt would have tendered the required payments under the Trial Period Plan, thereby entitling her to a permanent loan modification agreement. The final payment under the permanent modification would have been the same or less than the trial mortgage payment.[5] Therefore, Van Brunt would

---

[3]*See* HUD Mortgagee Letter 2013-32  ("Mortgagors with an active Chapter 7 or Chapter 13 bankruptcy case are eligible for FHA Loss Mitigation Options to the extent that such Loss Mitigation does not violate federal bankruptcy law or orders of the Bankruptcy Court or Bankruptcy Trustee.")

[4] *See* HUD Mortgagee Letter 2011-28, p. 2 ("Foreclosure action must be suspended during trial payment plans.")

[5] *See id.*

have been able to continue making the payments due and owed under the permanent modification agreement.

72.     On February 3, 2014, the COA sold Van Brunt's Home at auction.

73.     Van Brunt and her family were forced to move out of the Property on or about September 3, 2014.

74.     On July 1, 2014, Well Fargo obtained its Final Judgment in the Foreclosure Action. Wells Fargo scheduled the initial sale date on Van Brunt's Home for December 1, 2014. On January 5, 2015, Wells Fargo caused the Home to be sold at auction and acquired title to the property at the January 2015 sheriff's sale. *See Wells Fargo Bank, N.A. v. Rivera*, No. A-2042-14T4, 2016 N.J. Super. Unpub. LEXIS 1285, at *6 (App. Div. June 6, 2016).

75.     Wells Fargo maintained ownership to the Home until May 16, 2018, when it deeded the Home to Damars R. Duarte-Diaz. A copy of the deed is attached as **Exhibit 29**.

76.     On or about August 3, 2018, Wells Fargo filed a Form 10-Q with the United States Securities and Exchange Commission. The Form 10-Q is attached as **Exhibit 30**.

77.     The Form 10-Q identified a:

> [C]alculation error that affected certain accounts that were in the foreclosure process between April 13, 2010, and October 20, 2015, when the error was corrected … [a]s a result of this error, approximately 625 customers were incorrectly denied a loan modification or were not otherwise offered a modification in cases where they would have otherwise qualified. In approximately 400 of these instances … a foreclosure was completed.

*See Exhibit 30*.

78.     On or about September 20, 2018, Wells Fargo sent correspondence to Van Brunt (the "WF Letter") with the subject: "We made a mistake when we reviewed you for payment assistance." The WF Letter is attached as **Exhibit 31**.

79.     The WF Letter admits that "Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A." *See Exhibit 30*.

80.     The WF Letter states:

> We have some difficult news to share. When you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation, and we're sorry. **If it had been correct, you would have been approved for a trial modification.**
>
> **We want to make things right.**

*See Exhibit 30* (emphasis added).

81.     Through the WF Letter, Wells Fargo provided Van Brunt with a check in the amount of Twenty Five Thousand Dollars ($25,000.00).

82.     The WF Letter states that if Van Brunt feels that Wells Fargo has not "made things right" she could consider mediation and still cash the check. *See Exhibit 30*.

83.     As Van Brunt did not feel that Wells Fargo "made things right", on or about October 8, 2018, she filled out the mediation form (the "Mediation Request Form"). The Mediation Request Form is attached as **Exhibit 32**.

84.     The Mediation Request Form stipulates that Van Brunt is "not waiving any legal claims by participating in the process." *See Exhibit 32*.

85.     Van Brunt supplemented the Mediation Request Form to explain how Wells Fargo's "faulty calculation" affected her life (the "Financial Rationale"). The Financial Rationale is attached as **Exhibit 33**.

86.     In the Financial Rationale, Van Brunt details the damages caused by Wells Fargo's wrongful decision. *See Exhibit 33*.

87.     On December 28, 2018, the parties attended an unsuccessful three hour mediation in an attempt to resolve this matter.

88.     The alleged mediation was governed by a set of rules established by Wells Fargo that the mediator failed to provide to Van Brunt or her counsel. Wells Fargo representatives who participated also failed to provide any information regarding the specifics of the "faulty calculation".

89.     Enticing Van Brunt to sit on her rights and wait for this sham mediation to take place constitutes an additional unconscionable business practice.

90.     As Wells Fargo failed to "make things right", Van Brunt retained DannLaw to file the current matter against Wells Fargo for violations of the CFA, the covenant of good faith and fair dealing, and common law fraud based upon the wrongful denial of the loss mitigation application and concealment of the calculation error for nearly three (3) years, all to Van Brunt's great prejudice and damage.

91.     Wells Fargo's conduct directly and proximately caused the following damages to Van Brunt:

> A.     Wells Fargo took away the opportunity for Van Brunt to obtain a permanent loan modification and remain in the Property;
>
> B.     Van Brunt had to forfeit her Section 8 eligibility of $200.00 monthly in order to enter into the Loan and lost out on its benefits for the last four plus years;
>
> C.     Van Brunt has been forced to pay rent since losing the Property that has been at least $150.00 per month higher than her mortgage for the last four plus years;
>
> D.     Van Brunt's Daughter was forced to get her own apartment, costing her $1,250 per month.
>
> E.     Due to credit screening, Van Brunt's previous employer would not rehire her and she had to accept a large salary reduction as the foreclosure and delays in reviewing her loss mitigation application destroyed her credit;
>
> F.     Van Brunt had to retain legal counsel to file this complaint which would have never been needed had Wells Fargo correctly offered

Van Brunt a trial modification or met Van Brunt demands in mediation;

G.  Van Brunt has sought medical treatment for two major strokes and multiple minor strokes resulting from the lasting effect of the stress caused by Wells Fargo;

H.  Van Brunt suffered extreme emotional distress, resulting from:

   a. The unproductive and repetitive loss mitigation process;
   b. The wrongful denial of her loss mitigation application due to the "faulty calculation" error;
   c. The continuance of the foreclosure after the "faulty calculation" error;
   d. The loss of the home that her two children grew up in;
   e. Four years of on and off homelessness of her family; and,
   f. The ongoing medical issues.

I.  Van Brunt hoped and believed that by entering into a trial modification and a permanent modification of the Loan that she would be able to immediately begin the long process of improving her credit standing.

   a. Wells Fargo reported Van Brunt to the Credit Reporting Agencies as delinquent on the Loan leaving her unable to obtain credit or insurance at reasonable rates;
   b. Van Brunt could not obtain an automobile loan;
   c. Van Brunt could not be a co-signer on her son's student loans;
   d. Although Wells Fargo stated it would reach out to the Credit Reporting Agencies to remove any negative reporting, it waited years to correct the damage (even apparently after it knew it had made a mistake by not approving her for a trial modification).

## COUNT ONE
## VIOLATION OF N.J.S.A § 56:8-2, THE CONSUMER FRAUD ACT (CFA)

92.   Van Brunt restates and incorporates all of her statements and allegations contained in paragraphs 1 through 91, in their entirety, as if fully rewritten herein.

93.   Wells Fargo is a "person" as defined by N.J.S.A. § 56:8-1(d) because Wells Fargo is a partnership, corporation, company, trust, business entity, or business association.

94.   The CFA prohibits:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or

omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate...

N.J.S.A. § 56:8-2.

95.    In the operation of its business, Wells Fargo engaged in the use of unlawful practices through its conduct relating to Van Brunt's loss mitigation review and aggressively pursuing foreclosure against her.

96.    The CFA applies to mortgage servicing generally and to unconscionable business practices with regard to modification of mortgage loans.

97.    Despite Van Brunt having complied with all the obligations as required by Wells Fargo's loss mitigation process and otherwise qualifying for a trial modification, Wells Fargo misrepresented to Van Brunt that she had not qualified for the trial modification, when in fact she *had* qualified for the trial modification program which would have allowed her to remain in the property. Wells Fargo admits that but for its error, Van Brunt "would have been approved for a trial modification." Wells Fargo's affirmative misrepresentation in December 2013 about Van Brunt not qualifying for a loan modification constitutes an unlawful practice under the CFA.

98.    Had Wells Fargo advised in December 2013 Van Brunt that she qualified for the loan modification, Van Brunt would have taken immediate steps to resolve the COA Action, including, but not limited to, filing a Chapter 13 Bankruptcy Petition to repay the COA arrears. Wells Fargo's misrepresentations caused Van Brunt the ascertainable losses as plead, *supra*, at ¶ 91.

99.    For five and a half years, from 2010 until 2015, the bank's loan modification decisioning tools systematically miscalculated mortgage modification eligibility by adding (rather than comparing) state-specific maximum attorneys' fees. The error persisted despite consent

orders mandating increased vigilance. The bank initially discovered the error in 2013 but it took more than two years, until October 2015, to implement even a partial fix, despite internal warnings that using the fee matrix was "risky" and that it would only cost $61,950 to fix. Had Wells Fargo taken immediate action in 2013 to remediate the problem, it would not have issued Van Brunt the incorrect denial in December 2013. Instead, Wells Fargo waited until 2015 to even implement a partial fix and waited another three (3) years before disclosing this error to Van Brunt. Wells Fargo's actions here amount to unconscionable business practices. These failures caused Van Brunt the ascertainable losses as plead, *supra*, at ¶ 91.

100.    Wells Fargo discovered the existence of the "faulty calculation" as early as August 2013, but knowingly concealed or omitted this information from Van Brunt until September 2018.

101.    These acts in concealing the "faulty calculation" constitute unlawful acts in violation of the CFA. These acts in concealing the "faulty calculation" directly and proximately took away any opportunity Van Brunt would have had of keeping her home.

102.    Each unconscionable practice, false promise, misrepresentation, and/or knowing omission of material fact by Wells Fargo described, *supra*, constitutes a separate violation under the CFA.

103.    Wells Fargo's conduct has caused Van Brunt to suffer ascertainable losses, as plead, *supra*, at ¶ 91.

## COUNT TWO
## BREACH OF CONTRACT

104.    Van Brunt restates and incorporates all of her statements and allegations contained in paragraphs 1 through 91, in their entirety, as if fully rewritten herein.

105.    Van Brunt entered into a contract with Wells Fargo. The terms of the contract are set forth in the Note and Mortgage (collectively, except where inappropriate, the "Form Contract").

The Form Contract is a standard form document containing identical provisions as required by GSEs, HUD, and the HAMP. *See Exhibit 1*.

106.    Although HAMP and other government-mandated mortgage modifications were promulgated after Van Brunt entered into the Form Contracts with Wells Fargo, a reasonable interpretation of the Form Contracts required Wells Fargo to provide Van Brunt all available options to cure a default at the time of default, which was after the effective date of HAMP and other government-mandated mortgage modifications.

107.    The Form Contract required Van Brunt (among other things) certify under penalty of perjury that the information provided is truthful, provide authority to investigate their financial status, and agree to credit counseling.

108.    In consideration, Wells Fargo agreed via the Form Contract to evaluate Van Brunt for a temporary payment plan or modification program in compliance with the HUD requirements. Wells Fargo agreed via the Form Contract to offer Van Brunt the best temporary payment plan or modification program for which they were eligible.

109.    The Form Contract governs the relationship between Van Brunt and Wells Fargo with regard to temporary payment plan and modification programs pursuant to HUD requirements and incorporates by reference those HUD requirements. The Form Contract is signed by Van Brunt. If Van Brunt missed a mortgage payment, Wells Fargo was to send correspondence informing Van Brunt the amount owed and inviting the mortgagor to call Wells Fargo's "trained professionals" to help "determine the best option available" to the mortgagor. One such option was a loan modification, which could cure a default and bring a loan to "current" status.

110.    Van Brunt provided documents, information, and certifications in compliance with the Form Contract.

111.   As a result, Wells Fargo was required under the terms of the Form Contract to consider Van Brunt for a loan modification and to provide that loan modification if appropriate. Van Brunt was eligible for a HUD loan modification, but Wells Fargo did not offer Van Brunt the December 2013 loan modification. Wells Fargo failed to do so because of a faulty automated calculation. Had that automated calculation been correct, Van Brunt would have been approved for a trial modification. Wells Fargo breached its obligations to Van Brunt under the Form Contract.

112.   Wells Fargo's breach impacted Van Brunt at a time when she was experiencing extreme hardship. As a result of the faulty automated calculation, Wells Fargo incorrectly provided negative credit information to consumer reporting agencies. Wells Fargo failed to offer the trial modification. Ultimately, Van Brunt was damaged by Wells Fargo's breach.

113.   Wells Fargo also breached its duties under the Form Contract by failing to give them adequate notice of the mortgage modification.

114.   Wells Fargo discovered its "first" automated calculation error on or before October 2, 2015. While Wells Fargo states that it fixed the first automated calculation error on October 2, 2015, it failed to disclose the error to the public until August 3, 2018 and failed to disclose the error to Van Brunt until September of 2018. Despite admitting its error and that its error caused Van Brunt to suffer significant harm, Wells Fargo did nothing for almost three years to mitigate the harm it caused to Van Brunt, keeping the accounting error a secret. Wells Fargo breached the duty of good faith and fair dealing it owed to Van Brunt.

115.   Wells Fargo discovered its "second" automated calculation error on or before April 30, 2018. While Wells Fargo states that it "implemented new controls" on April 30, 2018, it failed to disclose the error to Van Brunt until September 2018. Despite admitting its error and that its

error caused Van Brunt to suffer significant harm, Wells Fargo has done the minimum to mitigate the harm it caused to Van Brunt. Wells Fargo breached the duty of good faith and fair dealing it owed to Van Brunt.

116.    Van Brunt was injured by Wells Fargo's breach of the Form Contract and suffered damages. In sending out the Apology Letter to Van Brunt, Wells Fargo admitted the breach; the only question that remains is the amount of damages, which is to be proven at trial.

<u>**COUNT THREE**</u>
**VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

117.    Van Brunt restates and incorporates all of her statements and allegations contained in paragraphs 1 through 91, in their entirety, as if fully rewritten herein.

118.    Van Brunt entered into a contract with Wells Fargo. The terms of the contract are set forth in the uniform borrower assistance form (the "Form Contract"). The Form Contract is a standard form document containing identical provisions as required by HUD.

119.    Every contract, including the Form Contract at issue in this case, includes and imposes upon each party to that contract a duty of good faith and fair dealing in its performance and enforcement.

120.    Wells Fargo agreed via the Form Contract to offer Van Brunt the best temporary payment plan or modification program for which they were eligible.

121.    The Form Contract governs the relationship between Van Brunt and Wells Fargo with regard to temporary payment plan and modification programs pursuant to HUD and incorporates by reference those HUD requirements. Van Brunt executed the Form Contract.

122.    Van Brunt provided documents, information, and certifications in compliance with the Form Contract.

123.    As a result, Wells Fargo was, when necessary, required to consider Van Brunt for a loan modification. Van Brunt was eligible for a HUD loan modification. But Wells Fargo failed to offer Van Brunt the December 2013 loan modification. Wells Fargo failed to do so because of a faulty automated calculation. Had that automated calculation been correct, Van Brunt would have been approved for a trial modification. Wells Fargo breached the implied covenant of good faith and fair dealing with Van Brunt under the Form Contract.

124.    Wells Fargo's breach of the implied covenant of good faith and fair dealing impacted Van Brunt at a time when she was experiencing extreme hardship.

125.    Moreover, Wells Fargo continued to act even after and failed to disclose when it learned that it had made an automated calculation error that negatively affected Van Brunt. Wells Fargo discovered its "first" automated calculation error on or before 2013. While Wells Fargo states that it fixed the first automated calculation error on October 2, 2015, it failed to disclose the error to the public until August 3, 2018 and failed to disclose the error to individuals it affected until September of 2018. Despite admitting its error and that its error caused Van Brunt to suffer significant harm, Wells Fargo did nothing for almost three years to mitigate the harm

126.    Wells Fargo discovered its "second" automated calculation error on or before April 30, 2018. While Wells Fargo states that it "implemented new controls" on April 30, 2018, it failed to disclose the error to the public until November 6, 2018. Despite admitting its error and that its error caused Van Brunt to suffer significant harm, Wells Fargo has taken minimal steps to mitigate the harm it caused to Van Brunt.

127.    Wells Fargo breached the duty of good faith and fair dealing it owed to Van Brunt by failing to maintain adequate procedures in support of its automated modification eligibility review programs.

128.    Van Brunt was injured by Wells Fargo's breach of its duty of good faith and fair dealing and suffered damages in an amount to be proven at trial.

### COUNT FOUR
### COMMON LAW FRAUD

129.    Van Brunt restates and incorporates all of her statements and allegations contained in paragraphs 1 through 91, in their entirety, as if fully rewritten herein.

130.    A cause of action for New Jersey common law fraud requires a plaintiff to prove: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.

131.    In August 2013, Wells Fargo first discovered its errors and knew that "incorrect Attorney's Fees [were] being calculate[d] in HPA that could be impacting decisions. *See Exhibit 6*. It then refused to take any substantive action to correct the mistake until October 2015. Accordingly, Wells Fargo was aware of this mistake in December 2013 when it misrepresented to Van Brunt that she did not qualify for a loan modification. Time and time again, Wells Fargo had the opportunity to address this mistake. Instead of investing a marginal sum to correct the error, Wells Fargo chose to assume the risk.  Van Brunt reasonably relied upon this misrepresentation in choosing not to contest the COA Action as there was no rational basis to do so as Wells Fargo held first lien priority. Wells Fargo's actions in failing to disclose this error to Van Brunt caused the damages plead, *supra*, in ¶ 91.

132.    Wells Fargo intended that Van Brunt rely on the misrepresentations in order to continue with the Foreclosure Case and avoid potential legal claims.

133.    Van Brunt reasonably relied on the misrepresentations because there was no possible way to discover that she was wrongfully denied until Wells Fargo informed her nearly five years later of the "faulty calculation".

134.    The damage to Van Brunt was foreseeable because Wells Fargo knew Van Brunt would lose her home after Wells Fargo improperly denied Van Brunt a loan modification. Wells Fargo was simultaneously pursuing a foreclosure and reviewing Van Brunt's eligibility for a loan modification.

135.    As Wells Fargo's conduct was willfully and wantonly reckless or malicious, Van Brunt is entitled to punitive damages.

## COUNT FIVE:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

136.    Van Brunt restates and incorporates all of her statements and allegations contained in paragraphs 1 through 91 in their entirety, as if fully rewritten herein.

137.    To establish an intentional infliction of emotional distress claim under New Jersey law, a plaintiff must show (1) that the defendant intended to cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the actions proximately caused emotional distress; and (4) that plaintiff's emotional distress was severe. *Witherspoon v. Rent-A-Center, Inc.*, 173 F. Supp. 2d 239, 242 (D.N.J. 2001).

138.    Plaintiff can demonstrate the first factor by showing the defendant "intended to produce emotional distress *or* acted in reckless disregard of [the] fact that probable [] emotional distress would result." *Mosley v. Del. River Port Auth.*, No. 99-4147 (JBS), 2000 U.S. Dist. LEXIS 22402, at *43 (D.N.J. Aug. 7, 2000) (emphasis added).

139.    For five and a half years, from 2010 until 2015, the bank's loan modification decisioning tools systematically miscalculated mortgage modification eligibility by adding (rather

than comparing) state-specific maximum attorneys' fees. The error persisted despite consent orders mandating increased vigilance. Wells Fargo's conduct (e.g. failing to fix a known error despite repeated warnings from regulators to clean up its loss mitigation practices) with respect to Van Brunt demonstrates that Wells Fargo abused its position and power and otherwise acted in a manner which was extreme and outrageous.

140.    Here, Wells Fargo acted with reckless disregard of the fact that probable emotional distress would result. Wells Fargo repeatedly failed to oversee, audit, and test its servicing, modification, and foreclosure practices, including its automated calculation software. Wells Fargo not only concealed its deceit from Van Brunt but also from Federal and quasi-Federal Agencies who were charged with oversight of Wells Fargo's mortgage loan servicing business[6]. It then used that automated calculation software to make automated decisions about offering modifications and whether or not its customers could keep their family homes. As a result of repeated federal investigations, fines, and consent cease and desist orders, Wells Fargo was on notice of its own deficient, unsafe, and unsound practices. Yet it allowed material errors in its software to persist for years, affecting hundreds of borrowers.

141.    Wells Fargo first discovered this error in August 2013 and knew that "incorrect Attorney's Fees [were] being calculate[d] in HPA that could be impacting decisions." By January 2014, in a preliminary review, Wells Fargo identified 50 loans where a loan modification had been wrongly denied. Yet somehow, Wells Fargo concluded in the same month that no modifications were wrongly denied and there was no urgency to fix the error. Wells Fargo acted with reckless

---

[6] These include Office of Comptroller of the Currency, SigTarp Inspector General in the United States Department of Treasury, Fannie Mae, Freddie Mac, The Federal Home Administration, a department of the United States Department of Housing and Urban Development and the Consumer Finance Protection Bureau.

disregard that its actions would cause Van Brunt emotional distress through initially ignoring this problem. Had Wells Fargo taken immediate action with regards to this error, Wells Fargo would not have misrepresented to Van Brunt in December 2013 that she did not qualify for a loan modification.

142.    Wells Fargo re-visited this issue during its July 2014 summit. Again, Wells Fargo acknowledged that the calculation error … "may lead to **incorrect mod program participation decisions by HPU**." Despite knowing it could be denying an "unknown" number of loan modifications because of "overstated fees," Wells Fargo acted recklessly in *still* failing to address the problem. These actions constitute extreme and outrageous conduct.

143.    In October 2014, a new project manager recommended a solution that would only cost the bank $61,950--or approximately .0007% of its 2014 annual revenue of $84 billion. Yet, Wells Fargo denied the funding request despite having actual knowledge that "[i]naccurate fees will continue to be quote." Here, Wells Fargo passed up yet *another* opportunity to redress the incorrect decision it issued to Van Brunt one year prior. Wells Fargo again demonstrated its reckless disregard for this known error by prioritizing profits over an effective solution. This conduct also demonstrates that Wells Fargo acted in an extreme and outrageous manner.

144.    On May 4, 2015, Susan Crawford, an Operational Risk Consultant, advised that the continued use of the fee matrix was "risky" and asked whether Wells Fargo would seek to try a fix or accept the risk. Recklessly and outrageously, Wells Fargo *continued* to accept the risk. Ms. Crawford continued to voice her concerns and finally, in October 2015, the fee matrix was removed from the HPA tool. Here, Wells Fargo continued kicking the proverbial can down the road and passed up yet *another* opportunity to redress the incorrect decision it issued to Van Brunt one year prior until October 2015, when Wells Fargo *finally* removed the HPA tool. Wells Fargo

29

further delays again demonstrated its reckless disregard that its actions would cause Van Brunt harm. This conduct also demonstrates that Wells Fargo acted in an extreme and outrageous manner.

145.     Between October 2015 and March 2018, Wells Fargo concealed this error from Van Brunt until it "rediscovered" the error (while reviewing a different error) and finally figured out that it harmed borrowers, including Van Brunt, from April 13, 2010 until October 20, 2015. Wells Fargo failed to disclose the error to Van Brunt until September 2018, representing: (1) five years and one month after it initially discovered the error; (2) four years and seven months after it initially discovered that the error caused wrongful modification denials; (3) and two years and 11 months after the error was fixed. Wells Fargo's actions in concealing this known mistake from Van Brunt demonstrate it acted in reckless disregard of the probable fact that Van Brunt would suffer severe emotional distress. Furthermore, Wells Fargo maintained ownership of the Home until May 16, 2018, and accordingly, Wells Fargo could have taken steps to mitigate its damage to Van Brunt. Instead, it intentionally waited until just months *after* selling the Home in May 2018 to disclose the faulty calculation error to Van Brunt in September 2018.

146.     As a direct and proximate result of Wells Fargo's conduct, Van Brunt has suffered both monetary losses and emotional distress as plead, *supra*, at ¶ 91.

147.     Van Brunt's emotional distress was so severe that no reasonable person could be expected to endure it.

148.     The damage to Van Brunt was foreseeable because Wells Fargo knew Van Brunt would lose her home after Wells Fargo improperly denied Van Brunt a loan modification. Had Wells Fargo issued  Wells Fargo was simultaneously pursuing a foreclosure and reviewing Van Brunt's eligibility for a loan modification.

149.    As Wells Fargo's conduct was willfully and wantonly reckless or malicious, Van Brunt is entitled to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Dawn Van Brunt prays that this Court enter its order granting judgment against Defendant Wells Fargo Bank, N.A. for the following:

A.    Actual damages of at least $75,000.00 and in an amount to be determined at trial as to Counts One through Five;

B.    Treble damages as to Count One;

C.    Costs and reasonable attorney fees as to Count One;

D.    Punitive damages as to Counts Four and Five,

E.    Such other relief which this Court may deem appropriate.

Respectfully submitted,

/s/ Javier L. Merino
Javier L. Merino
Dann Law
372 Kinderkamack Road, Suite 5
Westwood, NJ 07675
Phone: 216-373-0539
Fax: 216-373-0536
notices@dannlaw.com

## **<u>JURY DEMAND</u>**

Van Brunt hereby requests a trial by jury on all issues, with the maximum number of jurors permitted by law.

<u>/s/ Javier L. Merino</u>
Javier L. Merino
Dann Law